UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v. Case No: 2:14-cr-20-FtM-29CM

LORENZO D. HOOD

---

## REPORT AND RECOMMENDATION[1]

Before the Court is Defendant Lorenzo D. Hood's Motion to Suppress ("Motion") (Doc. 103), filed on August 25, 2014, which was referred to the undersigned by the Honorable John E. Steele for a Report and Recommendation. The United States filed its response in opposition on September 9, 2014 (Doc. 105). The undersigned held an evidentiary hearing on October 7, 2014. This case is currently set for the trial term beginning January 5, 2015, with a status conference to be held on December 8, 2014.

### I. Background and Summary of Arguments

Defendant Lorenzo D. Hood, along with four other defendants, is charged in a nine-count superseding indictment with conspiracy to possess with intent to distribute cocaine base, a/k/a "crack cocaine," and heroin, in violation of 18 U.S.C. § 846; and distribution of cocaine and heroin, in violation of 18 U.S.C. § 841. Doc. 31. He is charged in five of the nine counts, including Count IX, which charges Defendant

---

[1] Written objections may be filed within fourteen (14) days from the date of filing this Report and Recommendation. A failure to file timely objections waives a party's right to *de novo* review. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; M.D. Fla. R. 6.02(a).

alone with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g), 924(a)(2) and 924(e)(1).

Defendant seeks to suppress evidence found during a protective sweep of his residence incident to his arrest, specifically the firearms and ammunition for which he is charged in Count IX—a Remington model 870, 20 gauge shotgun, serial number RS15818A; a Ruger model SR-556, 5.56 mm caliber rifle, serial number 590-17459; a DPMS model LR-308, .308 caliber rifle, serial number 79446; a Maverick Arms model 88, 12 gauge shotgun, serial number MV84556M; a Mossberg model 500, 12 gauge shotgun, serial number T886352; a Marlin model 500, 12 gauge shotgun, serial number 01154956; twenty (20) rounds of Winchester 7.62 mm caliber ammunition; fourteen (14) rounds or Hornady, .223 Remington caliber ammunition; seven (7) rounds of Tulammo, .223 Remington caliber ammunition; and one (1) round of G.F.L., .223 Remington caliber ammunition—and "any and all direct and derivative evidence gathered by law enforcement" as a result of the protective sweep. Doc. 103 at 1, 2-3. Defendant argues that the evidence should be suppressed because officers had no reason to believe there was anyone else in Defendant's residence at the time of his arrest, and therefore they had no lawful authority to conduct a protective sweep. Instead, Defendant contends officers conducted the sweep to "create[ ] their own probable cause" to obtain a search warrant for the residence. *Id.* at 4. The Government asserts that the officers reasonably believed there was at least one other person in Defendant's residence, because during their surveillance they observed

movement on multiple occasions in a window located on the opposite side of the home from where Defendant eventually emerged.

The undersigned concludes that the officers reasonably believed there was at least one other person inside Defendant's home at the time of his arrest, and therefore the officers lawfully could conduct a protective sweep to ensure their safety. During the sweep, officers saw narcotics and related items in plain view, as well as the firearms and ammunition that are listed in Count IX of the superseding indictment. The evidence subsequently was seized pursuant to a valid search warrant supported by sufficient probable cause. The undersigned therefore respectfully recommends that the Motion be denied.

## II. Summary of Evidence

The Government called six law enforcement witnesses to testify at the suppression hearing: Candice Petaccio,[2] Christopher Tice, Scott Newbury, John Kinsey, Paul Smith and Christopher Lucas. The Government also introduced 29 exhibits, which were admitted into evidence. *See* Doc. 122. Defendant did not call any witnesses or introduce any exhibits. The testimony is summarized below.

[2] Petaccio has been employed by the Fort Myers Police Department ("FMPD") for eleven years and served as a narcotics and patrol officer. For the past three years she has been assigned to the DEA Task Force. Although Petaccio testified at the hearing, her testimony was largely to authenticate photographs she took of Defendant's residence that were used for demonstrative purposes during the hearing (Gov't Exs. 1A-1C and 3A- 3E). Petaccio also was involved in the investigation that led to the warrant for Defendant's arrest.

*a. Scott Newbury*[3] *and Christopher Lucas*[4]

Newbury was asked by Petaccio and another officer to help locate and arrest Defendant pursuant to a felony warrant issued by the Twentieth Judicial Circuit Court in and for Lee County, Florida (Gov't Ex. 2A). Newbury first associated the home at 1606 Hibiscus Avenue in Lehigh Acres, Florida with Defendant when he noticed that Defendant recently had updated the address on his driver's license to the Hibiscus Avenue address.[5] Newbury and Lucas began conducting surveillance at Defendant's residence on the morning of October 29, 2013 from a car that Lucas estimated was parked about 100-200 yards to the west of the residence. Lucas estimated they conducted surveillance for two hours or more prior to Defendant's arrest, and Newbury estimated that they watched the house for two to three hours before they decided to approach, in part because they needed back-up for the arrest. While they were surveilling the home, with the aid of binoculars they observed in the window directly to the left of the front door manipulation of the "plantation style" blinds with what looked to Newbury could have been binoculars, except that he could only see a single glare. Lucas testified that it appeared to him someone was looking out the window, but he admitted that he did not see a person, only movement. They also saw a black motorcycle parked outside the residence, and by contacting other

[3] Newbury has worked for FMPD as a traffic and narcotics officer since 2002 and has been assigned to the U.S. Marshals' Fugitive Task Force since November 2010.

[4] Lucas is a Detective with the Cape Coral Police Department ("CCPD") and is currently assigned to the Marshals' Task Force for four years. Lucas has also been a narcotics detective and worked patrol and street crimes during his eleven years with CCPD.

[5] Defendant's driver's license was last replaced on February 7, 2013. Gov't Ex. 5.

officers, Newbury learned that Defendant was known to use a motorcycle matching the description of the one parked at the home. Newbury was not given any information as to when Defendant was last seen riding the motorcycle, and no other vehicles were visible at the residence.

Once additional officers arrived, they knocked on the front door and rear windows, announced their presence and requested Defendant to open the door, but received no response. By this time, the blinds had stopped moving and officers could not hear any movement or other noises within the home. The fact that no one was answering the door and officers could not see or hear any movement suggested to Newbury that someone could be barricading themselves inside. After 15-20 minutes of knocking, officers entered the residence and remained near the front door while calling for Defendant and anyone else inside to reveal themselves.

Newbury estimated that three to four minutes elapsed between when officers entered and Defendant emerged from a room on the right side of the home, opposite from where he had seen movement in a window. Defendant was arrested and taken into custody a few feet inside the residence, but he was moved outside by the time officers began checking the home to see if anyone else was inside. Newbury's role at the time of Defendant's arrest was to hold a ballistic shield and provide cover for the other officers until Defendant was secured, at which time he and Lucas began checking rooms on the left[6] side of the home to ensure no one else was inside who

[6] Newbury and Lucas testified to clearing both the "left" side and "north" side rooms. When facing the home, the left side is the north side. *See* Gov't Exs. 1A-1C.

might present a danger to officers. Newbury believed someone else may have been in the residence, because Defendant emerged from the opposite side of the home from where the blinds had been moved and Defendant's attitude and conduct appeared "evasive." While conducting the sweep, Newbury saw a scale and what he believed was narcotics residue in the kitchen area.[7] In the room to the left of the front door where officers had seen the blinds move, Newbury saw in plain view a rifle, gun case and scope, the latter which he thought was consistent with the object he saw in the window that was being used to manipulate the blinds (Gov't Exs. 4D, 4E). Lucas also observed the firearm and scope lying on the floor and noticed that the closet door was open. Believing that someone could be hiding inside, Lucas opened the door and saw several more firearms. Newbury also looked in the closet to ensure no one was hiding inside and then continued to clear the rest of the house. Newbury estimated that the total time it took officers to conduct the protective sweep was three to four minutes, and Lucas testified he thought the sweep took a "couple" of minutes. They did not find anyone other than Defendant in the home. Based upon what the officers observed in plain view during the sweep, they contacted Lee County Sheriff's Office ("LCSO") narcotics officers to obtain a search warrant.

*b. Paul Smith*[8]

Prior to the officers entering the home that day, Smith was watching the rear of Defendant's Hibiscus Avenue residence from his car approximately 40-60 yards

[7] A diagram of the residence shows that the kitchen area was adjacent to the front door area where Defendant was taken into custody (Gov't Ex. 7B).

[8] Paul Smith has been a Deputy United States Marshal for about twenty-three years.

away. He did not notice any movement or activity from that position, where he sat for about forty five minutes. Although Smith did not see any movement while he was standing near the front door, about five minutes before officers breached the door Deputy Kinsey[9] told Smith that he saw movement in the window next to the front door. After Defendant was secured by another officer, Smith checked the kitchen and the master bedroom from where Defendant emerged. Upon exiting the master bedroom, he saw what he believed was cocaine residue and drug paraphernalia on a bureau near the bedroom.

*c. John Kinsey*

Kinsey was part of the entry team positioned at the front of Defendant's residence. While officers knocked on the front door, he observed movement in the window to the left of the door from his position on a side walkway. He estimated that officers knocked for five to eight minutes before they entered the home. After Defendant was secured and taken into custody, Kinsey and Deputy Smith cleared the master bedroom and bathroom areas on the right side of the residence, and Kinsey noticed a Pop Tarts box containing white powder that he believed to be cocaine. He did not find anyone else in the home.

*d. Christopher Tice*[10]

Tice was notified by the LCSO Warrants Unit that they had located Defendant in his residence, and during a protective sweep they saw items in plain view that

[9] John Kinsey has been a Deputy United States Marshal for over four years. He also spent five years with LCSO and nine years with the Roswell, Georgia police department.

[10] Tice has been with LCSO for approximately ten years and since October 2013 has been a Detective in the special investigations unit responsible for narcotics investigations.

appeared to be narcotics. Tice went to Defendant's residence, spoke with detectives on the scene and then, using information relayed to him by the officers, sought and obtained a state search warrant (Gov't Ex. 2B). Tice also performed a walk-through of the residence and took photographs prior to the execution of the search warrant (Gov't Exs. 4A-4G), which he estimated occurred about two and a half hours after he was first contacted by the Warrants Unit. During the walk-through if Tice noticed anything of interest he then went back and took close-up pictures of the item.

Based on his experience, Tice identified a digital scale located on the kitchen island (Gov't Ex. 4B) and saw what he believed to be narcotics near the scale (Gov't Ex. 4C). While in the room to the left of the front door, Tice saw and photographed a scope and an open gun case that contained a rifle (Gov't Exs. 4D, 4E). Tice also took photographs of the Pop Tarts box located near the kitchen area by the master bedroom that contained what appeared to be narcotics or a cutting agent (Gov't Ex. 4G)[11] and one of a motorcycle parked next to the front door (Gov't Ex. 6). He explained that the photos of the rifles found in Defendant's residence were taken in a law enforcement facility either later on the night of October 29, 2013, or possibly the next day (Gov't Exs. 8A-8G).

## III. Analysis

Defendant's motion states that he "was outside the residence, handcuffed, and placed in a law enforcement vehicle when agents re-entered the home" and that Defendant and the agents were outside during the protective sweep. Doc. 103 at 4,

---

[11] Ultimately, the substance in the Pop Tarts box was determined not to be narcotics but a cutting agent.

6. The Court need not address arguments further because it finds credible the officers' testimony that Defendant was first secured inside.[12]

Although Defendant does not appear to challenge the authority of the officers to enter his home to execute the arrest warrant, the Court finds that officers' actions in breaching the door and entering the home were lawful. In *Payton v. New York*, the Supreme Court explained that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 603 (1980). The Eleventh Circuit has interpreted *Payton* to "require[ ] a two-part inquiry: first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995). When evaluating whether officers had a reasonable belief that Defendant was inside the home, the Court must consider "common sense factors indicating a resident's presence," such as that the individual

---

[12] At the hearing, all four officers who were present for Defendant's arrest testified that they were inside when they first made contact with Defendant and that he was then secured, "passed back" and taken into custody by other officers, who may have been outside. The officers explained that this procedure enables those in the front holding ballistic shields to begin clearing rooms to ensure no one else was inside who could ambush or harm them. Moreover, Defendant's own motion identifies "the place of his arrest in the home." Doc. 103 at 6. Even if Defendant had been arrested outside, that alone does not preclude a determination that an otherwise valid protective sweep is lawful. As the Eleventh Circuit noted, "[w]e have previously upheld protective sweeps of residences that stemmed from arrests made outside those residences." *United States v. Vazquez*, 406 Fed. Appx. 430, 433 (11th Cir. 2010) (citing *United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) (*en banc*) (protective sweep of home following defendant's arrest in garage was permissible) and *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983) (protective sweep of home reasonable after defendant arrested on open porch built as part of the home)).

may be aware that police are trying to determine whether he is home, and neither absolute certainty nor direct evidence is required. *Id.* at 1535, 1538.

Here, officers had a valid arrest warrant for Defendant, issued by a Lee County judge, for sale or delivery of cocaine and possession of cocaine.[13] *See* Gov't Ex. 2A. Officers reasonably could have believed that Defendant lived at 1606 Hibiscus Avenue, because his Florida driver's license listing the Hibiscus Avenue address had been replaced only eight months earlier. *See* Gov't Ex. 5. Moreover, officers' knowledge that a motorcycle parked outside the residence was associated with Defendant and their observations of movement in the home supported the officers' reasonable beliefs not only that the residence was Defendant's but also that Defendant was inside. *See United States v. Bellamy*, 456 Fed. Appx. 863, 865 (11th Cir. 2012) (presence of car last known to be driven by the defendant at residence believed to be the defendant's "represent[ed] a specific fact" indicating the defendant would be present in the residence at the time officers decided to enter); *United States v. Beck*, 729 F.2d 1329, 1331-32 (11th Cir. 1984) (despite "no outward appearing 'signs of life'" in defendant's apartment, officers could reasonably have believed he was home because his car was parked nearby, it was early in the morning and "it was reasonable to expect a fugitive to hide"); *United States v. Litteral*, 910 F.2d 547, 554 (9th Cir. 1990) (lower court's finding that officers reasonably believed defendant was home was not clearly erroneous where informant told agents that if a particular vehicle was at the residence the defendant would be there and the vehicle was present

[13] Defendant does not argue that the arrest warrant was invalid.

at the time they entered the property). Here, officers' entry of the home was therefore lawful, and the key issue before the Court is the legality of the protective sweep performed by officers either simultaneous with, or immediately after, Defendant's arrest in his home on October 29, 2013.

The authority of officers to conduct a protective sweep[14] of a home to ensure their safety was first recognized by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990). In that case, after the police called the home and spoke with the defendant and another person, officers went to the home and, once inside, "fanned out" throughout the first and second floors. *Id.* at 328. After the defendant emerged from the basement and was secured by one officer, another officer entered the basement to verify that no one else was present and in plain view observed evidence connected with the armed robbery. *Id.*

The Court noted it was undisputed that up to the point of Buie's arrest officers could search anywhere in the house that he may have been located, pursuant to the authority of the arrest warrant, so the issue was what level of justification was required for the second officer to enter the basement to see if anyone else was present.

[14] The Supreme Court defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person may be hiding." *Buie*, 494 U.S. at 327.

*Id.* at 330. After considering the justifications set forth in its opinions in *Terry v. Ohio*[15] and *Michigan v. Long*,[16] the Court stated:

> There is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . . Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Buie*, 494 U.S. at 333. The Court further explained that officers are permitted "to take reasonable steps to ensure their safety after, and while making, the arrest." *Id.* at 334. To do so, there "must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

The authority of officers to conduct a protective sweep, however, is not unlimited; a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to

[15] 392 U.S. 1 (1968) (authorizing limited search for weapons even in absence of probable cause to arrest where officer has articulable suspicion that a person is armed and dangerous).

[16] 463 U.S. 1032, 1051 (1983) (applying the principles enumerated in *Terry v. Ohio* to find protective search of vehicle compartments lawful when officers have "articulable and objectively reasonable belief that the suspect is potentially dangerous").

complete the arrest and depart the premises." *Id.* at 335-36. The Eleventh Circuit has upheld a protective sweep where the purpose was to secure the home and investigate the officers' reasonable suspicion of danger, the sweep lasted only one minute, officers looked only in areas large enough to hide a person, and there were "strong indications" that the defendant did not act alone, including that he was observed with a female companion and during one recorded phone call he was heard talking to another person in the home. *United States v. Hromada*, 49 F.3d 685, 687, 690-91 (11th Cir. 1995). Similarly, in *United States v. Delgado*, 903 F.2d 1495 (11th Cir. 1990), the court upheld a protective sweep of a warehouse and seizure of evidence because agents had reason to believe at least one person was inside who could pose a danger after seeing someone run inside, and the evidence found during the protective sweep was located in plain view during a cursory inspection that lasted "no more than three to five minutes." *Id.* at 1502.

Courts have refused to uphold the validity of protective sweeps where officers could not articulate reasons for believing someone else was in the home or where officers' conduct before or during the sweep was inconsistent with a reasonable belief of danger. In *United States v. Scott*, 517 Fed. Appx. 647 (11th Cir. 2013), a case cited by Defendant as his "best case" in support of suppression, officers did not have a warrant for the defendant's arrest but saw and smelled marijuana when the defendant opened the door. *Id.* at 648. After arresting the defendant outside, officers entered the home and observed bags of marijuana and a handgun. *Id.* The Eleventh Circuit found that a protective sweep was not justified because, unlike here,

"[o]fficers testifying at the suppression hearing could not identify *any* articulable fact which would lead a reasonable person to believe that another person was home at the time of [the defendant's] arrest." *Id.* at 649 (emphasis added). In *United States v. Rodgers*, the court determined that the officer's entry into the home was not justifiable as a protective sweep based upon the officer's failure to check the entire residence, to determine if a woman inside posed a threat and to discover a co-defendant in the residence. 924 F.2d 219, 222 (11th Cir. 1991). Instead, it was clear the officer entered solely to seize contraband. *Id.*

In another case factually distinguishable from the case under review, *United States v. Chaves*, agents arrested two suspects outside a warehouse and then waited forty-five minutes for other agents to arrive before breaking into the warehouse to conduct a warrantless search during which incriminating evidence was discovered. 169 F.3d 687, 692 (11th Cir. 1999). The court rejected the government's argument that the initial warrantless entry of the warehouse was permissible as a protective sweep, stating "the government's own action undermine[d] any claim that the entry had a protective purpose" because the sweep did not immediately follow the arrest, and the fact that agents sat in their cars for forty five minutes after the defendants arrest suggested they "saw no immediate need to enter the warehouse to protect themselves or other persons in the area." *Id.* at 691, 692. As in *Scott*, in *Chaves* the court further noted that "the government has failed to point to any 'specific and articulable' facts that would lead a reasonably prudent officer to believe that, at the time of the sweep, a sweep was necessary for protective purposes," and "none of the

agents offered any concrete factual basis for believing that there was either additional cocaine or individuals inside the warehouse." *Id.* at 692 (quoting *Buie*, 494 U.S. at 332). The Court explained "[t]his is exactly the kind of 'mere inchoate and unparticularized suspicion or hunch' that *Buie* indicates is insufficient to support a warrantless sweep." *Chaves*, 169 F.3d at 692 (quoting *Buie*, 494 U.S. at 332). Defendant argues that the actions by the officers in the present case similarly undermine any claim that their entry into the home had a protective purpose. Doc. 103 at 6 (citing *Chaves*, 169 F.3d 687, 692 (11th Cir. 1999)). The Court disagrees.

Here, the testimony of the officers was that once backup arrived, they immediately approached the residence, knocked on the front door and back windows and announced their presence.[17] Although officers continued to knock and announce for up to twenty minutes[18] prior to entering the home, Officer Newbury testified that they did so because they knew someone was in the home based on the earlier movement of the blinds, and the fact that they no longer saw movement or heard any noises could indicate that whomever was in the home might be attempting to barricade themselves inside. *See United States v. Burrows*, 48 F.3d 1011, 1014 (7th Cir. 1995) (stating that lower court, in finding valid protective sweep, "commented

---

[17] The fact that officers waited until backup arrived before attempting to enter the home can also support a finding that officers reasonably believed that Defendant was dangerous. *See United States v. Caraballo*, 595 F.3d 1214, 1225 (11th Cir. 2010) (it was not error to apply protective sweep doctrine where officer "called for back-up from other law enforcement officers because the suspects' conduct made him nervous, and, notably, he did not board the vessel to conduct a search until back-up arrived.").

[18] Officer Newbury and Deputy Smith testified that they continued to knock and announce their presence for 15-20 minutes, but Deputy Kinsey estimated that they knocked and announced their presence for 5-8 minutes before entry.

that the officers had been refused admission to the apartment for a period of twenty to thirty minutes, a factor that might also indicate to an objective person, to an officer, that someone else might be present." (quotation marks omitted)). The actions of the officers in the present case—continuously knocking and trying to coax Defendant to come outside and then conducting the protective sweep either simultaneous with or immediately after Defendant's arrest—are therefore distinguishable from those of *Chaves*, where officers merely sat in their cars, never attempted to see if anyone was inside and did not conduct the sweep until substantial time had passed.

Although the facts articulated by officers here to support their belief that someone else was inside the residence may not be as numerous or obvious as those in other cases in which courts upheld protective sweeps, such as in *Hromada* where the defendant was observed and heard speaking with another person[19] or in *Delgado* where agents observed an individual run into a warehouse, the present case also is distinguishable from those cases in which the court determined that officers failed to identify sufficient facts to justify a protective sweep. For example, in *Scott* officers could not identify *any* articulable facts to support a reasonable belief that someone else was in the defendant's home. The present case also is distinguishable from those cases in which courts determined that officers' actions were not a protective sweep at all, as was the case in *Rodgers* where officers re-entered the residence for

---

[19] *See also Vazquez*, 406 Fed. Appx. at 433 (protective sweep justified where officers were told a confidential informant had observed other individuals in the defendant's home and officers witnessed other individuals coming and going while conducting surveillance).

the sole purpose of retrieving evidence and did not attempt to look throughout the residence to determine if other people were present.

Here, at least three officers saw movement in a room on the opposite side of the house from where Defendant eventually emerged. Deputy Kinsey observed movement in the window a short time before officers entered the residence, which is consistent with Deputy Smith's estimation that only five minutes elapsed between when Kinsey told him that he saw movement at the window and the officers' entry. This supports a reasonable belief that someone else may have been in the home at the time of officers' entry, which is all that *Buie* requires. *See Burrows*, 48 F.3d at 1013, 1014 (officers' observation of movement of curtain while they were outside "raised the contingency of another person being present"); *United States v. Malady*, 209 Fed. Appx. 848, 852 (10th Cir. 2006) (finding protective sweep justified based on a variety of factors including defendant's "significant delay in responding to the door" and "the video camera pointing at the officers from the upstairs window").

Moreover, Officer Newbury described Defendant's attitude and conduct when he finally emerge from the bedroom as "evasive." Courts have held that a defendant's nervous and agitated conduct can support a reasonable belief that other people may be present. *See United States v. Legette*, 260 Fed. Appx. 247, 250 (11th Cir. 2008) (protective sweep fell within the ambit of *Buie* where officers were lawfully inside the home and the defendant's agitated movements caused concern that other individuals may have been hiding inside); *Caraballo*, 595 F.3d at 1225 (protective sweep of boat cabin was reasonable based upon defendants' conduct, which included

providing inconsistent answers to the officer's questions and appearing "extremely nervous").

The fact that officers ultimately did not discover anyone except Defendant during their protective sweep does not diminish their reasonable belief that someone else was inside. In *United States v. Davis*, the Eleventh Circuit held that the lower court did not err when it determined that officers were justified in conducting a protective sweep of the defendant's apartment at the time of his arrest based upon one officer hearing a noise coming from within the apartment. 153 Fed. Appx. 670, 672 (11th Cir. 2005). Although no one other than the defendant was found at the home and the court acknowledged that the officers "would likely have had no reason for sweeping other rooms in the apartment absent the thump or thud he heard in the bedroom," the court held that it was not unreasonable for officers to conduct a protective sweep. *Id.*

Here, not only does the Court find that officers have articulated specific facts to support a reasonable belief that someone other than Defendant may have been inside the residence, the Court also finds that the sweep was sufficiently limited in duration and scope. Officer Newbury estimated that the protective sweep lasted three to four minutes, Officer Lucas testified they were only in the house performing the sweep for a "couple" of minutes, and both Officers Newbury and Lucas testified that their purpose in conducting the sweep was to look for other individuals who may have been inside. Thus, the information available to the officers at the time they entered Defendant's residence to execute the warrant reasonably supported a

conclusion that Defendant was inside, officers articulated specific facts to support their reasonable belief that someone else may have been inside and, as the court held in *Magluta*, "[o]nce the marshals possessed this valid justification to enter the residence they were entitled, pursuant to *Maryland v. Buie*, to engage in a protective sweep of the premises. Any evidence discovered in plain view during the sweep was properly used to secure a search warrant for the premises." 44 F.3d at 1538 (citation omitted); *see also United States v. Tobin*, 923 F.3d 1506, (11th Cir. 1991) (stating "[t]he agents were, of course, free to seize any evidence they discovered in plain view within the proper scope of the protective sweep); *Davis*, 153 Fed. Appx. at 672 (finding "no error in the determination that the police were justified in conducting a protective sweep of the apartment where Davis was arrested and, therefore, were entitled to seize any evidence in plain view."). The same holds true here.[20]

## IV. Conclusion

Officers learned of Defendant's Hibiscus Avenue address from his driver's license and their observations of a motorcycle associated with Defendant at the residence, and movement of window blinds suggested he was home. The officers testified that they believed someone else was inside the home at the time of

---

[20] Even if the court were to find that the protective sweep was invalid, the officers testified that the drug paraphernalia and residue were visible in plain view from the area inside the residence where they initially made contact with Defendant. As the Eleventh Circuit explained in *Hromada*, "[i]f an officer has lawfully executed a valid arrest warrant, he is not required to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid further charges." 49 F.3d at 690. Thus, officers' sighting of the drug paraphernalia was sufficient probable cause to apply for and obtain a search warrant. Nevertheless, the Court need not reach that determination because that argument was not raised by the parties, and the sweep was lawful and properly limited.

Defendant's arrest, and they articulated specific facts, namely the movement of the blinds on the opposite side of the home from where Defendant eventually emerged as few as five minutes before officers breached the door, to support that belief. Thus, under *Maryland v. Buie*, officers were entitled to conduct a protective sweep of the residence to ensure their safety. The sweep in this case properly was limited in duration and scope, and the evidence discovered in plain view during the protective sweep could lawfully be used to seek a search warrant, which was done in this case. Suppression of the firearms and other evidence observed during the properly limited and lawfully conducted protective sweep is therefore not warranted.

Accordingly, it is **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress (Doc. 103) be **DENIED**.

**DONE** and **ENTERED** at Fort Myers, Florida on this 20th day of October, 2014.

CAROL MIRANDO
United States Magistrate Judge

Copies:

The Honorable John E. Steele
United States District Judge

Counsel of Record